The President
delived the opinion of the Court.
This was an appeal from the High Court of Chancery. It came on to be heard in June Term 1791; but the questions being of consequence to the parties, and their decision important to the community, the Court, not having a library at hand, or leisure to digest the variety of adjudged cases relied on in argument, took time to consider of it, and directed the cause to be re argued.
That has been done this term ; and the Court have derived much satisfaction from the laborious researches, and able reasonings of the gentlemen at the bar. They have now directed me to pronounce their final decree.
The case depends upon the will of Joseph Sheltons a rich old batchelor, which was dated and published September 20th, 1770 : but he lived fourteen years after, and in that time purchasing other land called *73 Williamsons, to which he removed part of the slaves from the plantations devised in his will, and purchasing other slaves, part of which were placed on these plantations ; and there being three slaves, (which may deserve a distinct consideration) which belonged to the ¡fian tat ions devised, but were occasionally absent at his death ; and he dying in September, 1784, without having revoked, republished, or altered his will; great difficulty is occasioned in Respect to the first and most important question in the cause, which is :
1st, Whether -all the testators slaves shall pass by the generality of the words “ all my slaves young and old,” as would have been the case, had he died in 1770 ; since he had, then, no plantation but those devised, nor any slaves, but upon those plantations, to have made the words (i on all my plantations above named,” restrictive, if such he intended it.
If he did not pass, a second subordinate question has been made \ whether the devise shall be confined to such slaves as the testator had at the publication of his will, in exclusion of those after purchased; or, whether the will shall speak at his death, and confine the bequest to such as were then upon the devised plantations, excluding such as were at Williamsons or elsewhere.
In discussing this question, it is agreed on all hands, that, the testators intention is to be the rule of decision ; but the gentlemen at the bar have labored on the one side to enlarge, and on the other to narrow, the sources from whence we are to collect that intention.
It is said, 1st, we must collect it only from the written will, disregarding the parol proof and all other circumstances.
2d. That we must confine our contemplations either to the time of the publication of the will, or to the time of the testators death.
As to the first, it would be a strange waste of time to go over the string of decisions upon the admission of parol proof to explain, and even to contradict, written wills, more especially as they are in direct opposition to each other, and it is impossible to reconcile *74 them. Indeed since the case of Brown v. Selwyn, Ca. Temp. Talb. 240, which was affirmed by the lords, and judgments have been more uniform, and the admission of parol proof less latitudinous; and if any rule upon the subject can be said to be fixed it seems to be this, that it is not to be admitted to contradict the common meaning, or legal import, of plain words in a will, but shall be allowed to explain a person or thing intended by doubtful words, cr to correct mistakes in either discription. 2 Atk. 372.
But that, under the latter allowance, parol evidence of the testator’s circumstances, situation, connections with the legatees, and his transactions between the making of his will and death, are to be admitted to discover his intention—the Chancery books, ancient and modern, abound with instances.
As to the trite objection, that counsel would not know how to advise, if judges are to go out of the written will; I answer,
1st. That counsel, in general, would be very inattentive, not to enquire (previous to giving an opinion) whether there were no change in the testator’s situation and circumstances subsequent to the making of the will, especially in a case like this, w'here the testator lived so long after; from whence revocations or ademptions of legacies from change of circumstances were, least, to be suspected.
2d. That without such enquiry into extraneous circumstances, it would be difficult to discover from this will, any thing to restrain the generality of the words “ all my slaves young and old on all my plantations,” by the words, “ above named,” since it does not appear by the will that he had other plantations or slaves.
As to the second objection, “ that we must confine our view of the will to circumstances, either at the date of the will or at the time of the testator’s death, and not regard both I answer, that as we should frequently come short of the intention, by being confined to either, so I conpeive we are not only authorised, but compelled, to view circumstances at, and from the former period, to the latter, to discover what was his *75 original intention, and whether that continued to the time of his death, or was legally controuled by what happened in the mean time.
And this is proved : 1st, From the legal idea of a will, which we are told has its inception from the making, and its conswnmation by the death, shewing it to be one continued act. 1 P. Wms. 97.—Salk. 237, —2 P. Wms. 28.
2d. From precedents.
In the case of after purchased lands, which will not pass by a devise “ of all the estate or lands I shall have at my death,” you view the date of the will, and introduce the conveyance for the purchase, to shew it to be subsequent. This land will not pass, not for want of intention, but from the controul of law upon that intention; for under the same devise, after acquired chattels would pass. This is one instance oflookIng to both periods, and an intervening act.
Another is, the known disputes about the ademption of legacies. You view the will, and find the legacy given, but at the testator’s death, the subject is not found in his estate. Whether this be an ademption or not, depends on the testator’s intention. Ca. Temp. Talb. 227. This is the general rule. B t an intention to revoke is not to be presumed, 3 Bac. 470.
As to a specific thing devised and afterwards sold by the testator: if merely voluntary, it is an ademption, because no other motive appears. But if compelled to pay debts, or to provide immediate necessaries, it is not so, since here is another motive, and his intention to revoke is not presumed, and the money for which the thing was sold is to be paid out of the residue, 3 Bac. 470, Swinb. 524. 3 Bac. 480.
As to a devise of a specific sum of money in the hands of, or due from, a certain person; the testator receives the money ;—this is no ademption.
In Gilb. 32. 2 Vern. 681. 2 P. Wms. 165, a distinction is made where the payment is voluntary by the debtor; in which case it is no ademption. If compelled by the creditor, it is.—
But this distinction is exploded upon better reason *76 ing. 1 Eq. Ca. Ab. 32. 1 P. Wms. 464, 561. 1 P. Wms. 469. Ca. Temp. Talbot 227.
The great desideratum is in the testator’s intention; but in equity it is important to consider how it affects the residuary estate, which is discharged of a debt by the sale of the specific thing, and augmented by the receipt of the special debt.
This is another instance in which we must view the whole case to ascertain the intention of the testator : and as this' depends on parol proof, it aids the answer to the first objection as to admitting parol proof.
We may reason as to the general rule from our act of wills in 1785, upon the subject of implied revocations, though it does not affect this case; and there that must be done, which both objections oppose.
Many other instances may occur, but these may suffice to shew, that we must consider the will upon its own words, and the parol proof as to the situation and circumstances of the testator when it was made, and at his death.
On a general view of this will, the testator appears to intend the disposition of his whole visible property.
His male relations were three surviving brothers, and two nephews, sons of his eldest brother and' heir, who was dead.
He had five plantations, and devised one to each of those five, with the stocks, plantation utensils, and appurtenances, to each belonging. Whether they were nearly equal, and that he meant to pursue the Jewish system of primogeniture, giving his eldest brothers sons a double share; or from what other motive he acted, does not appear, and is unimportant. However he makes provision out of his nephew John’s land for his sister Mary Truehart for life or widowhood, and gives her for the same term, some slaves by name, and stocks by number; at her death the stocks with the land, were to go to John, and he gives to his nephew William 200l.
He then devises all his household furniture to his *77 brother William, and to his nephew John, equally to be divided.
Then comes the clause on which the dispute arises, —All my negroes young and old at all my plantations above named to be equally divided between my three brothers David, Samuel and William, and those lent to sister Truehart, also, after her death or widowhood.”
He then gives 130/., pecuniary legacies, and adds this clause : “ If my nephews, John and William, should either of them die before marriage or without issue, the legacy above left to one, shall fall to the other brother : and should both die without such issue or marriage, then the legacy left to them, shall be equally divided between the three brothers, David, Samuel and William and appoints them executors without any residuary clause.
If the testator had died at that time, there could have been no doubt but that all his slaves would have passed to his brothers, since whatever he might mean by the words, on my plantations above named, they could not then have operated restrict}vely, he having no other plantations, nor other slaves than were upon them.
It has been admitted, that the words u ail my slaves’’ were sufficient to pass all he had, if he so Intended 5 and it has been argued that the following words must have been added for some purpose, and that has been variously supposed to be, amplification, explanation, restriction, or that they had no meaning, and were thrown in by the writer cúrrente calamo.
The words “ all my slaves” were so plain and comprehensive, as not to leave, in the ordinary understanding of men, any doubt of their meaning, so that he could not intend to amplify or explain : the conjecture, that he meant to shew he did not mean to pass the slaves by the word appurtenances, used in the devise of lands and stocks, is ingenious but not found. That word appurtenances, was probably never in the testator’s mind: it was the writers, and unluckily used by *78 him for the purpose (as he declares) of expressing the testator’s meaning.
“ Young and old” was probably his also, and can have no effective meaning. “ On all my plantations above named,” could not in the testators views of things, at that time, act as a restriction, and therefore it struck me at first, that he could not so intend it: but I accounted for their use by supposing that he reasoned thus : “ I have severally disposed of my lands and stocks by plantations, and now give all my slaves on all those plantations as a stock, to be equally divided between my brothers:” differently from the disposal of the lands and stocks. And the testator not meaning them restrictive at the time, they extended to all, then; and dying without altering his will all at his death ought to pass.
On more mature reflection, I discover an intention which he might have had in using those words. He disposed of all the lands and slaves he had then; but as he might live to acquire more, which he chose should depend on his futute disposition, he used specific terms to confine the devises to the land and slaves he then possessed. Whether this was really his intention or not, is immaterial; since, if it be possible that it might have been his intention, it is sufficient to prevent the Court’s rejecting the words, as having no meaning.
This must be taken therefore as a specific restrictive devise of the slaves on certain plantations, and not a devise of all his slaves.
His intention afterwards is argued both ways : on one side it is said that intending to devise all when he made his will, and dying without altering that will; we must suppose he intended all should still pass.
On the other side, it is condended, that since we must suppose him to know how the devise was restrained, and finding him purchasing a plantation and making new arrangements of his slaves, fixing some on that, which would operate as an exclusion of those from the devise, and yet not altering his will, we ought to conclude he meant that those slaves, as well *79 as the land, should be left to the disposition of the law.
Whatever might be his real indention, the latter supposition is what reason and precedent will impel the court to adopt.
In very many cases of local devises, the Court discover a principle to influence their decision on this point; but to state a few will be sufficient.
2 Fern. 747, was a hard case in itself, and I believe would not at this day be so determined, under its particular circumstances. But the rule there laid down seems a good general one, “ that where goods In a house are devised, a voluntary removal of them in the testators’s life time, without tort or fraud, is a revocation.
2 Fern. 739, goods prepared and intended to be sent to the house, do not pass. 2 Fern. 688. What he had at Wouston at his death passed.
The after-purchased slaves are not tobe distinguished from the others.
1st. The testator, as to lands, speaks from the date of the will: as to personals, at his death. And slaves from their nature, (from their being purchased without a conveyance recorded, and from the act of assembly, where they are devised,) are to be ranked in the personal class.
2d. The restriction and devise, is not of negroes by name, but by the plantations: they were upon them, and those found there at his death will pass, whenever acquired.
Upon this point therefore, the court decide the devise to be confined to the slaves on the devised plantation at the time of the testator’s death, in exclusion of those at Williamsons ; but are of opinion, that their settled habitations, as fixed by the testator, ought to give the rule, and not any casual absence therefrom at his death, which could never be supposed to influence his intentions.
The proofs furnish an instance: All the working slaves from Williamson’s were at work at the home- *80 house, (Horse Shoe,) the instant of the testator’s Could that circumstance make them pass ?
Many other instances occur : A servant sent on an errand : wagoners abroad on duty, and others.
The young negroes sent from the devised plantations to assist poor people, to remain there at will, or exchanged as Sampson was for Tom, furnish no proof of an intention to change their residence or to affect the devise. Such too is the case of the girl Rachel, and the boy Cudjo sent to Williamson’s to work for a short time, (not to reside there,) just before his death; so the negro Mark, sent from Williamson’s in like manner to assist a poor family, is to be excluded from the above devise. The Chancellor’s decree therefore as to this point, is to be varied so as to take from the heir the negroes Sampson, Cudjo, and Rachel the spinner, and their profits : the negro Mark, as well as all the others belonging to Williamson’s, descend to the appellee as heir at law.
The slaves devised to Mary Trueheart, being specified by name, passed in remainder to the three brothers wherever resident at the testator’s death.
2d. The next question respects the crops, whether they pass by the word “ appurtenances” used in the devise of the lands and stocks, or go into the surplus as undisposed of.
Here we encounter an objection from the act of Assembly passed in 1748, Ch. 3, § 30, which declares “ That where a person dies between the 1st of March, and 25th of December, the servants and slaves he is possessed of shall be continued on the plantations until the latter day, for making and finishing a crop; which when made and finished, shall be assets in the hands of executors and administrators, after the expence of clothing and feeding them, of tools and utensils, quit-rents of the lands, levies, and other incidental charges are deducted.” This it is said, is a legislative disposition of the crops, and restrains the power of testators to dispose of such crops.
But this construction does by no means accord with my idea of the spirit of the act.
*81 This clause was clearly intended to suspend the devises of the lands and slaves, or their descent to heirs, until Christmas next after the testator or intes*tate’s death, and to appropriate both to the purpose of finishing a growing crop, which would otherwise be lost to the family and community. As to the crops, the primary design was to ease the lands of quit-rents and other charges of that year, and to provide food and clothing for the slaves, as a compensation to their proprietors for their having been employed in this beneficial work; but as to the surplus, it says no more but generally, that it shall be assets in the hands of the executors or administrators.
What is the consequence of the surplus being assets? Does it belong to the executors ? No gentleman thinks so; but they say it will go into the residuum. This must depend on the will, and seems to admit the ground of the opinion of the Court, that the testator has the same power over this surplus of his crops, as he has over his other estate.
Nay, I have no doubt, but that a testator might go further than the surplus, by devising the crops entire, and directing the charges upon the lands, and the food and clothing for the slaves, to be paid out of his residuary estate ; since justice to the proprietors of the lands and slaves is fully done, according to the intention of the act, and the testator’s power over that, which the law declares, shall be assets in the hands of his executor, ought not to be restrained.
It is yet assets, and like all other personal legacies, must pass through executors hands, and is only perfected by his assent, that (if necessary,) he may retain and apply it to the payment of debts ; but if that be not necessary, a Court of Equity will compel his assent according to the will of the testator.
The case of Lord Bristol v. Hungerford, Prec. Chan. 81, and 1 Eq. Ca. Ab. 244, is a devise of a surplus raised by sale of lands, “ to be deemed part of his personal estate and go to his executors.” This case is stronger than our act, vet the surplus was *82 distributed as undisposed of, though it conveys the same idea.
Upon the whole of this point, we are clear that the testator had power to dispose of the surplus of the* crops. And we come to the question, whether he has done so in the devise of the lands and stocks, &c. which are alike, and one only need be noticed.
“ I give my brother David Shelton all my lands at Wild Boar Creek, in Goochland County, to him, and his heirs forever, with all the cattle, horses, hogs, and other utensils, and appurtenances thereto belonging.”
If the crops pass at all, it must be under the word appurtenances, which I am inclined to think sufficient for the purpose, and that it was his intention the crops should pass with every thing else on the plantations, except the slaves, (a distinct and important class of property,) which he afterwards particularly devises, but is silent as to the crops.—
To admit the evidence of Mr. Todd, (the writer of the will,) that he was directed to devise the crops, and thought he had done so by this word, would be warranted by innumerable precedents in the English Chancery.
However, I am not fond of this dangerous kind of evidence, since, though Mr. Todd’s function and character entitle him to credit, yet we must adopt general rules. I am therefore, inclined to take it upon the words of the will itself.
The determination in Trafford v. Berrige, 1 Eq. Ca. Abr. 201. § 14, and others of the same kind, “ that a devise of all his goods, chattels, household stuff, furniture and other things which would be in his house at his death, should be confined to things of the same nature and species of those mentioned, and not extend to 265/. specie found in his house,” does not seem to apply ; since that was founded on the words, other things, at the close of a string of things mentioned.
But in this will, after a devise of the lands, (as the principal,) it goes on with “ all the cattle, horses, hogs, utensils, and appurtenances thereto belonging *83 making each a distinct relative description and de» vise, which has the land for its correlative : and the words thereto belonging, have the same effect, as if inserted after each as “ the cattle belonging to the said lands See,” so that we are to read the will “ I give my lands with the appurtenances thereto belonging,which would include the crops growing according to the legal technical meaning of that term. For I take it, that a grant of lands and appurtenances, would pass growing crops to the purchaser, if no reservation were made, which would not violate the principle <( he that sows shall reap,” since that right to reap, like all other property may be transferred.
The crop severed indeed would not pass by such a grant, and can only pass by this will, on a supposition that the testator intended to make no difference and from the difficulty of distinguishing which was severed.
The date of his will, and his death, happened in the same month, though fourteen years distant. It was in September, when corn is not severed ; perhaps the fodder was, and probably all or most of the tobacco.
The case is doubtful, and though I am rather of opinion myself that he intended to devise die crops, I can without any reluctance yield to the opinion of my brethren, that they do not pass, but must go into the surplus, and it only remains to consider,—»
What is to become of that surplus ? Does it belong to the executors; or is to be distributed to the next of kin ?
This is a question of difficulty, requiring laborious researches, and upon which we might find in theChaneery books, like Croke’s Law Reports, precedents for almost any opinion we should incline to give on the subject. Yet when we have laboured through the various and contradictory decisions, the principles which are to govern them, do not seem to be so very difficult to ascertain.
As a precedent, our judgment may not perhaps be so important as I at first thought it, if I am not mistaken in my conjecture, that our new statute of dk *84 tributions, has put an end to the dispute as to all cases subsequent to its passage, by directing distribution “ where the person dies intestate as to his personal estate, or any property thereoj P’ this however is just hinted at, without giving any opinion on it.
To state the principles—there are two, which seem the ground work, and are fixed.
1st. A legal one. “ That the naming of an executor, is a disposition to him of all the personal estate, and after payment of debts and legacies, the surplus belongs to him as a recompense for his labour and trouble.” 2 Bac. 423, Wentw. Off. Ex. 4, and if the Spiritual Court at this day are about to compel the executors to distribute the surplus to the next of kin, the Kings Bench will grant a prohibition. 5 Mod. 247.
2d. A contending principle of equity, “ that where there is fraud in obtaining the executorship, or it manifestly appears to have been the testator’s intention, the executor should not have the surplus, a Court of Equity will consider the executor as a trustee only as to the surplus, for the next of kin.” 2 Bac. 423.
This we are told, was first introduced about a century ago in Foster v. Munt, 1 Vern. 473, where an express pecuniary legacy was given to the two executors of 10/. each for their care and pains ; which it was said, was apparent evidence of his intention to exclude them from the surplus, since the legacy being to come out of the surplus, the testator could not intend to give them part and the whole. And to this apparent proof of the testator’s intention in cases of pecuniany devises, in consideration of care and pains, and in a few other instances, was the rule confined at first, but soon branched into a variety of other considerations, which produced determinations not to reconciled in principle to each other, and which must be resolved into the different inclinations of the Chancellors to favor, some the legal, others the equitable rule, and endeavouring to make the favoured rule apply to the case before them.
Thus some attack the rule of law, and oppose to it *85 the statute of distributions, which they allege gives the next of kin a title to such of the personal estate as is not disposed of; similar to that which the heir has to the real estate—1 P. Wms. 554.—2 P. Wms. 210. —3 Atk. 203 : and that the office being in its nature fiduciary, and not beneficial, therefore the executor ought to take no more than is given him, and be a trustee for the residue :—Whilst others lament that ever the rule of equity was introduced, and will not interfere with the executor’s title, but upon the most irresistible proof appearing in the will of an intention to exclude him.' 2 Bac. 423, to 426. 1 Bro. C.C. 330.
__
Sometimes a distinction is made between a specific and a pecuniary devise to the executors, Prec. Chan. 231, 316. This again is exploded in other cases, Cas. Temp. Talb. 3 Atk. 226.
Sometimes the circumstance of the executor’s being a near relation, or a stranger, is thought important. In other instances that is denied, 1 P. Wms. 544.
And finally parol proof of the testator’s intention is admitted in many cases, and denied in others.
From hence it may be concluded, that an enquirer after principles can derive very little satisfaction from those cases : those who are curious, and have leisure, may recur to them. I shall pass them over, and confine myself to a few modern cases, where most of the others are brought into review.
Farrington v. Knightly, 1 P. Wms. 544, was this, “ the testator declared, as to his personal estate (if he should leave any) he gave 50/, to his brother A, and 50/. to his nephew B, whom he made executors; gave 20/. each, to others of his relations, several of whom were his brothers, nephews and nieces, (and as such amongst his next of kin entitled to distribution under the statute,) and then abruptly broke off without the usual conclusion, In witness &c., or making any disposition of the surplus which was 1200/.” On a question between the executors and next of kin, who should have the surplus, Lord Parker takes notice of the cases on both sides, which he endeavours to reconcile with the principle he affirms, viz. that where *86 there is an express legacy to the executor, or to the . executors equally (if, as in that case, there be more than one) it shall exclude them from the surplus, even though there were legacies also to the next of kin.
As to the reason of the case he says : “ it is most plain that making a person executor, ought not to amount to a gift of the personal estate ; it is no more than making him a trustee, the very word executor importing, ex vi termini, that he was only appointed to execute the will, and to have nothing but the management of the personal estate. That he is a trustee as well of the specific legacies, as of the surplus, since the former passes to the legatee by his assent only.”
He concludes for the equitable principle pari ratione, and decrees a distribution independent of the circumstance (which no doubt was weight}) of the will being unfinished, and a devise of the surplus, probably prevented. This case was plainly within the rule of equity, being a pecuniary legacy of equal sums to each of two executors, which in every instance since Foster and Munt, deprived the executor of the surplus, except when in the will itself, or from parol proof, it appears the testator intended to give it him, the contrary of which appeared in this case.
A distinction between equal and unequal bequests to a plurality of executors, were taken in Bachellor v. Searle, 2 Vern. 736 ; affirmed in Basbridge v. Woodroffe, 2 Atk. 68, and seems established in Bowker, et al. v. Hunter et al., 1 Bro. C. C. 328, first decreed by Lord Thurloxv, and on re-hearing, that decree affirmed by luoxáJLoughborough. The case was this, viz: The testatrix devised 200/. to Mr. Hunter, and after many intervening legacies to other persons, amongst whom were some (but not all) of her next of kin, she gave 50/. to Mr. Eaton, added some charitable legacies, and made Hunter and Eaton executors, but made no disposition of the surplus.
Here was a case divested of all influence from parol proof, or the relation which subsisted between the testatrix and the executors on the one side, and the next *87 of kin on the other: in short, no favourite wife to claim the assistance of the Court: but it depended simply on . the will, and whether the testator’s intention to deprive the executors of the surplus, was to be presumed from his having devised them pecuniary legacies.
It is obvious that Lord Thurlow's general reasoning is opposed to Lord Parker's, in making the legal, the general rule, and the equitable principle, only an exception from it. The consequence each draws from thence is materially different. Lord Thurlow's is, “ that the rule £ that the executor shall take the residue,’ must prevail, unless there be an irresistible inference to the contrary.” Lord Parker's is, ££ that the next of kin have the apparent right, and there must be a devise of the surplus to the executors, either expressly, or unavoidably implied, to exclude the next of kin.”
Lord Loughborough reasons with less appearance of bias than either; confesses there is great difficulty in the cases, but as neither the legal rule ££ that the appointment of an executor, is a gift to him of the whole,” nor the equitable one “ that a legacy given to him excludes him from the surplus,” can be shaken; he thinks a more certain principle cannot be laid down in the application of the equitable rule to particular wills, than was mentioned by Lord Mansfield, in Lawson v. Lawson, in the House of Lords. 7 Brown’s Par. Cases, 511. ££ Thai where the legacies to executors are consistent with their taking the residue, there is no implication to exclude them, though he confessed there was great latitude'in it.” On that ground was the decree in the case then before the Court made, because the devise to one of the executors being of 200/. and to the other of 50/. it was not inconsistent with their taking the surplus, since the latter was to be equally divided, and the former taken out in unequal portions. This being a very late case, and agreeable to those in 2 Vernon -¿máAtlcyns, seems to give some-rule by which to conduct ourselves in examining what was the testator’s intention in the present will, and *88 whether the bequests to the executors, be consistent with their taking the surplus?
The devise of lands to them separately, if equal, would be unimportant, because, with that species of property, executors have nothing to do, as executors.
The devise of the slaves I take to be on the same ground of reasoning as to the present question, since, if undisposed of, they descend to the heir, and do not go into the surplus either for the executors or next of kin.
The excluding legacy must be of a personal thing, which, if not devised, would belong to the surplus, to bringit within the ground of objection, that the testator did not intend to give all and some.
The bequests of personal things to the three brothers therefore are only to be viewed, laying aside the devises to them of the lands and slaves.
To his brother David he gives “ all his horses, cows, hogs, and utensils, on his Goochland plantation.”
To Samuel“ all his horses, cows, hogs and utensils, at Liclcing-Hole
To William “ all his horses, cows, hogs, and utensils, at the home plantation, and half his household furniture, to be divided between him and his nephew William
And having created cross remainders between his nephews William and John, dire.cts “ that if both die unmarried, or without issue, the legacy to them should be equally divided between the three brothers.”
I think the testator so far from intending to exclude his executors by these legacies from the surplus, plainly intended it for them.
Having disposed of his visible property which he contemplated and described, he proceeds to give pecuniary legacies to the amount of 330/., without making any provision for raising, or directing who should pay, either those or his debts, which he had said should be paid, or the expenses of his funeral and administration. These he knew must be defrayed by his executors out of his money, certificates, and other things which constitute the surplus; and not having *89 made an exact estimate of the fund, or the charges, he intended the brothers should take the one, to answer the other, without account to any person.
His having given all his slaves to his three brothers, and giving them all that was devised to his only other relations of his name, his nephews William and John, upon their dying without issue, creates a strong presumption that, if he had made a residuary clause, it would have been in their favour.
Then to take it upon the rule laid down by Lord Mansfield, affirmed by Lord Thurloxo, and which Lord Lougborough considers as the best general one which can be adopted, I do not consider these devises as at all inconsistent with their taking the surplus as executors,
1st. It is not a devise to them jointly by the de° scription of executors, but a separate devise to each as brothers, without mentioning the office or making any allusion to it.
2d. But the principal point is, that the legacies are unequal; and if any point on this loose question can be said to be uniformly decided, this is, viz. that unequal legacies do not exclude the executors jointly from the surplus; we are therefore of opinion that the surplus goes to the executors.
The decree must be reversed. The plaintiff is entitled to the 200/. devised to William with interest from a year after the testator’s death, and to sixteen slaves, undisposed of, and their profits. The crops made the year the testator died did not pass to the devisees of the plantations by the word “ appurtenances,” but, after paying the several charges directed by the act of Assembly, the balance is to go into the surplus of the personal estate : and that surplus, after payment of debts, legacies, funeral and charges of administration, and the costs of this suit on both sides, belongs to the executors.
As to all other matters; the bill is to be dismissed, and the costs of both Courts must be paid by the executors out of the surplus.(1)

 The Commonwealth v. Martin’s Ex. & Devisees. 5 Munf. 134